**Christopher M. MISSETT, Appellee**

v.

**HUB INTERNATIONAL
PENNSYLVANIA,
LLC, Appellant.**

Superior Court of Pennsylvania.

Argued May 19, 2010.
Filed Sept. 23, 2010.

Jed L. Marcus, Florham Park, N.J., for appellant.

Lawrence H. Pockers, Philadelphia, for appellee.

BEFORE: ALLEN, LAZARUS, and FREEDBERG *, JJ.

OPINION BY LAZARUS, J.:

Hub International Pennsylvania, LLC ("HubPa"), appeals the judgment entered on January 7, 2010 in the Court of Common Pleas of Montgomery County in relation to an Order dated December 17, 2008, granting appellee Christopher M. Missett's ("Missett") Motion for Declaratory Judgment[1] and denying HubPa's Motion for

---

\* Retired Senior Judge assigned to the Superior Court.

1. Missett's actual filing was styled as a "Verified Complaint for Injunctive Relief," and

Preliminary Injunctive Relief. After careful consideration, we reverse and remand for further proceedings.

In or around July 2000, Missett became employed by Clair Odell Insurance Agency, LLC ("Clair Odell") as a "producer," or salesperson, in the company's life/benefits department. In this capacity, Missett originated business for the company, negotiated with potential clients and ensured that existing clients received the coverage and services that they expected. R.R. 266a–267a.

On July 1, 2000, Missett executed a Producer Agreement with Clair Odell, which contained a non-solicitation clause preventing Missett from soliciting Clair Odell's clients or prospective clients for two years following termination of the Agreement. The Agreement also provided that certain of Missett's clients (the "exempt clients") were excluded from the non-solicitation provision.

In 2001, Citizens Financial Group ("Citizens") purchased the membership interest[2] in Clair Odell, later changing the name of the company to Citizens Clair Insurance Agency, LLC ("Citizens Clair"). On December 31, 2002, Missett entered into a second Producer Agreement[3] that amended and restated the original 2000 Agreement. The 2002 Agreement contained the same confidentiality and non-

solicitation provisions as the 2000 Agreement (including those provisions regarding the exempt clients). The 2002 Agreement also provided as follows:

- That Missett's employment would automatically extend for successive one-year terms unless either party, in the sole discretion of the electing party, elected not to extend the Agreement upon written notice; and

- Information and documents furnished to or prepared by Missett, in the course of his employment, remained the property of [employer] and required Missett to return all said information and documents to [employer] upon termination of his employment for any reason. Missett agreed that he would not divulge, disclose or use any of this information or documents for his, or any other firm's, direct or indirect benefit.

Producer Agreement, 12/31/02, R.R. at 980a–993a.

On June 30, 2005, Missett and Citizens Clair entered into an "Amendment to Producer Agreement" in which Missett sold to Citizens Clair his "exempt clients" in exchange for the sum of $300,000.00. Specifically, the Sales Agreement provided as follows:

---

sought both a declaratory judgment as well as preliminary and permanent injunctive relief. *See* Complaint, R.R. at 6a.

**2.** A "member" of a limited liability company is defined as "[a] person who has been admitted to membership in a limited liability company and who has not dissociated from the company." 15 Pa.C.S.A. § 8903. A "membership interest" is an ownership interest in a limited liability company and is akin to an interest in stock of a corporation. Interests may be evidenced by a certificate of membership interest, similar to stock issues. *Comment: New Business Options in Pennsylvania: A Critical Analysis of the Pennsylvania Limit-*

*ed Liability and Limited Liability Partnership Act of 1994*, 57 U. PITT. L. REV. 129, 134 (Fall, 1995). Like a corporation, LLC members' liability is limited to the amount of capital invested. *Id.* at 130; 15 Pa.C.S.A. § 8922.

**3.** For a period of time following acquisition by Citizens Financial Group, the company continued to be known as "Clair Odell." Thus, although this amended Producer Agreement was executed after the purchase of Clair Odell by Citizens, the company was still known as "Clair Odell" and the Agreement was between Missett and Clair Odell.

In exchange for a lump-sum payment of $300,000 payable on July 15, 2005, the business previously listed on Schedules D and E [i.e. the exempt clients] will become clients of the company and be protected by the non-compete provisions of the contract.

R.R. at 119a.

In 2006, Hub U.S. Holdings, Inc. ("Hub U.S.") entered into a Purchase and Sale Agreement with Citizens, pursuant to which it acquired all of the issued and outstanding membership equity interests in Citizens Clair. The name of the company was subsequently changed to Hub International Pennsylvania, LLC.

The Purchase and Sale Agreement entered into between Citizens and Hub U.S. included the following provision with regard to employment matters:

(a) Effective as of the Closing Date, the Buyer shall cause the Companies (or their successors or assigns) to abide by the terms of the employment agreements of the Companies' employees set forth on Schedule 5.7(a), as they existed as of the Closing Date except as they may be modified in the ordinary course of business, of which true, complete and correct copies have been made available to the Buyer.

R.R. 1121a–1122a. Missett's Producer Agreement was specifically included in Schedule 5.7(a).

Missett was terminated by HubPa on April 29, 2008. The stated reason for his termination was that HubPa did not want to pay his high commission schedule. N.T. 10/2/08, at 98–99. Thereafter, an attorney for HubPa sent Missett letters "remind[ing] [Missett] of [his] post-employment obligations to Hub, including, but not limited to, [his] contractual obligations contained within the Confidential/Non–Solicitation Agreement … executed with Clair Odell Insurance Agency, LLC[.]" R.R. at 972a. Missett subsequently initiated litigation seeking to enjoin HubPa from enforcing the Non–Solicitation Agreement, as well as a declaratory judgment that the Agreement is unenforceable.

HubPa responded and asserted a counterclaim for injunctive relief. In its pleadings, HubPa alleged that, at the time of his termination, Missett had misappropriated certain confidential and proprietary information, including files and documents relating to prospective clients. HubPa sought return of its property, compensatory damages and enforcement of the Non–Solicitation Agreement.

After a two-day hearing, the trial court found the restrictive covenant to be unenforceable against Missett and denied HubPa's request for an injunction. Hub's post-trial motions were denied and this timely appeal followed.

HubPa raises the following issues on appeal:

I. WHETHER THE TRIAL COURT ERRED IN RULING IN FAVOR OF MISSETT AND HOLDING THAT THE RESTRICTIVE COVENANT WAS INVALID AND UNENFORCEABLE AS A MATTER OF LAW?

II. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT HUB LACKED STANDING TO ENFORCE THE RESTRICTIVE COVENANTS?

III. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT INVOLUNTARY TERMINATION OF EMPLOYMENT MANDATES A FINDING THAT A RESTRICTIVE COVENANT IS UNENFORCEABLE, EVEN WHEN THE EMPLOYEE HAD PREVIOUSLY SOLD ACCOUNTS TO THE EMPLOYER FOR A SUBSTANTIAL SUM OF MONEY?

IV. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT THE JUNE 30, 2005 AGREEMENT IN WHICH MISSETT SOLD HIS BOOK OF BUSINESS TO HUB WAS NOT ENFORCEABLE?

V. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN REFUSING TO ADMIT EVIDENCE CONCERNING THE NEGOTIATION AND MEANING OF THE JUNE 30, 2005 AGREEMENT?

VI. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT PERMITTED MISSETT TO ADMIT INTO EVIDENCE THE DEPOSITION TRANSCRIPTS OF THREE WITNESSES IN CONTRAVENTION OF THE RULES AGAINST HEARSAY WHEN COUNSEL FAILED TO ESTABLISH THE REQUISITE FOUNDATION FOR THEIR ADMISSION?

VII. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING HUB'S APPLICATION FOR INJUNCTIVE RELIEF?

■■■ When reviewing the determination of the trial court in a declaratory judgment action, our scope of review is narrow. *Palladino v. Dunn,* 361 Pa.Super. 99, 521 A.2d 946, 948 (1987); *Supp v. Erie Insurance Exchange,* 330 Pa.Super. 542, 479 A.2d 1037 (1984). As declaratory judgment actions follow the practice and procedure of an action in equity, we will review the determination of the court below as we would a decree in equity and set aside the factual conclusions of the trial court only where they are not supported by adequate evidence. *Palladino,* 521 A.2d at 948. However, when reviewing an issue of law in a declaratory judgment action, our scope of review is plenary and our standard of review is *de novo. Wimer*

*v. PEBTF,* 595 Pa. 627, 939 A.2d 843, 850 (2007).

We first address the question of Hub-Pa's standing to enforce the restrictive covenants. In ruling on this issue, the trial court concluded that HubPa lacked standing because Missett did not enter into a restrictive covenant with HubPa; rather, the agreements containing the restrictions were entered into with Missett's prior employers, Clair Odell and Citizens Clair. Implicit in this ruling is a belief on the part of the trial court that with each successive transfer of ownership, the company became a new, separate and distinct entity and, accordingly, absent a specific provision in the Agreement allowing for assignability, HubPa lacks standing to enforce the covenants against Missett.

Conversely, HubPa argues in its appellate brief that:

> While the name of the entity changed over time, it remained a single legal entity. Because the company remained the same legal entity regardless of whether it was called Clair Odell, Citizens Clair or HubPa, the company retained standing to enforce the restrictive covenants and there was no need for an assignment of the agreement.

Brief of Appellant, at 24. In support of this position, HubPa asserts that the transaction between Hub U.S. and Citizens was an equity transfer of Citizens Clair and not an assignment and that, after the transfer of shares, Hub U.S. simply changed the name of the company to Hub-Pa. HubPa cites *Siemens Medical Solutions Health Services Corp. v. Carmelengo,* 167 F.Supp.2d 752 (E.D.Pa.2001), for the proposition that an employee "should not be deemed to work for a new employer simply because the name of the corporation changed and the corporation's shares have changed hands."

In response, Missett cites *Hess v. Gebhard & Co., Inc.,* 570 Pa. 148, 808 A.2d 912 (2002). In that case, an employee challenged a covenant not to compete when he left his job following the acquisition, by asset purchase agreement, of his employer, Hoaster, Inc., by Gebhard & Co. In *Hess,* our Supreme Court held that "a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets." *Id.* at 922 (emphasis added). In reaching this conclusion, the Court emphasized the trust between employer and employee, which it viewed as the touchstone of the employment contract. In that regard, the Court noted that "[t]he fact that an individual may have confidence in the character and personality of one employer does not mean that the employee would be willing to suffer a restraint on his employment for the benefit of a stranger to the original undertaking." *Id.* As an asset purchase results in an entirely new employer/employee relationship, the Court concluded that the restrictive covenant could not be assigned to a new employer, absent the existence of an assignability provision in the employment contract.

In the case *sub judice,* Missett's Producer Agreement contained an assignment provision which provided, in relevant part, as follows:

> (d) Assignment. The rights or obligations contained in this Agreement (i) may be assigned by the Company to an Affiliate (as defined under the Securities Exchange Act of 1934, as amended)[.]

Amended Producer Agreement, R.R. at 41a. The Securities Exchange Act of 1934 defines an "affiliate" as "any company that controls, is controlled by, or is under common control with another company." 15 U.S.C. § 78c (referring to the definition of "affiliate" found in 12 U.S.C. § 1841(k)). Based on this definition, it is clear that HubPa is not an "affiliate" of Citizens Clair and, thus, were assignability to be the controlling issue, the Supreme Court's holding in *Hess* would be determinative. However, because we conclude that Missett's "employer" remained the same, the Agreement's assignability is of no moment.

■■■ A corporation is a separate, fictional legal person distinct from its shareholders or employees. *Tayar v. Camelback Ski Corp.,* 957 A.2d 281, 289 (Pa.Super.2008). "[A] corporation is an entity irrespective of ... the persons who own its stock." *Commonwealth v. Monongahela Bridge Co.,* 216 Pa. 108, 64 A. 909, 912 (1906). Thus, when an individual, group of individuals or company purchases some or all of the stock in a corporation, the corporation's shareholders change, but the corporation itself remains the same legal entity as it was prior to the stock purchase.

■ In the case *sub judice,* Hub U.S. purchased from Citizens all the outstanding membership interests in Citizens Clair Insurance Agency, LLC by Agreement dated March 1, 2006. Purchase and Sale Agreement, R.R. at 1091a. Subsequently, by Consent in Lieu of a Meeting of the Sole Member, dated March 29, 2006, the first sentence of Article I of the company's Operating Agreement was amended to effect a name change as follows: "The name of the limited liability company is Hub International Pennsylvania LLC." Consent in Lieu of Meeting, R.R. at 1169a. The company thereafter filed a Certificate of Amendment with the Pennsylvania Department of State, Corporation Bureau, reflecting the name change. Certificate of Amendment, R.R. at 1165a.

Although cited by neither party in its brief, the recent Superior Court case *J.C. Ehrlich Co., Inc. v. Martin,* 979 A.2d 862

(Pa.Super.2009), addresses a nearly identical factual situation as is presented in the matter before us. There, Martin was employed by Ehrlich as a pest control service technician. *Id.* at 863. His employment agreement included a covenant not to compete.[4] *Id.* In 2006, Ehrlich entered into a stock purchase agreement with Rentokil, Inc., which essentially consolidated the two companies. *Id.* at 864. Martin continued to work for the company until 2007, when Martin terminated his employment with Ehrlich and began operating his own pest control business in the same central Pennsylvania territory serviced by his former employer. *Id.* As a result, Ehrlich filed for an injunction pursuant to the non-compete clause of Martin's employment contract. *Id.* The trial court granted a permanent injunction and Martin appealed. On appeal, Martin, relying on *Hess,* argued that the covenant was not assignable and, thus, not enforceable in light of the consolidation of Ehrlich and Rentokil. *Id.* at 865. This Court disagreed, stating that "unlike in *Hess,* Ehrlich and Rentokil merely accomplished a stock purchase, not the sale of Ehrlich's assets." *Id.* at 866. Thus, Martin's employer remained the same and the covenant remained enforceable.

In addition to this Court's decision in *Ehrlich,* two federal courts applying Pennsylvania law have had occasion to address the same issue. In *Siemens Medical Solutions Health Services Corp. v. Carmelengo,* 167 F.Supp.2d 752 (E.D.Pa. 2001), which predated our Supreme Court's decision in *Hess,* Siemens ac-quired all the stock of SMS Corporation, Carmelengo's employer. Carmelengo had signed an employment agreement with SMS which included certain restrictive covenants. Carmelengo continued to work for the company for a period of time after its acquisition by Siemens; however, he subsequently accepted employment with a competitor. Thereafter, Siemens applied for injunctive relief to enforce the restrictive covenants contained in Carmelengo's employment agreement. Carmelengo moved for dismissal, asserting that Siemens could not enforce the restrictive covenant because it was not a party to the employment agreement. Carmelengo contended that the purchase by Siemens of the stock of SMS resulted in a change in his employer and, because his agreement contained no assignability clause, the agreement could not be enforced by the "new" employer.

In concluding that the agreement was enforceable against Carmelengo without specific assignment provisions, the court noted that "[i]t is a basic tenet of corporate law that a change in stock ownership is merely a transfer of shareholder rights which does not, in and of itself, normally affect the existence of the corporate entity." *Id.* at 758. As a result, the court reasoned that "Carmelengo should not be deemed to work for a new employer simply because the name of the corporation changed and the corporation's shares have changed hands." *Id.* at 759.

More recently, the U.S. Court of Appeals for the Third Circuit addressed this question in *Zambelli Fireworks Manufac-*

---

4. Unlike the employee in *Ehrlich,* who had signed a traditional "non-compete" agreement in which he agreed not to engage in the same or similar line of business as his employer within a stated geographic area for a period of time, Missett entered into a non-solicitation agreement. This agreement does not limit his ability to seek employment in the insurance industry; rather, it merely requires that he refrain from utilizing proprietary and/or confidential information obtained during his employment with HubPa to solicit customers or prospective customers of HubPa for a period of two years following his termination.

turing Co., Inc. v. Wood, 592 F.3d 412 (3d Cir.2010). There, the court specifically distinguished *Hess*, noting that *Hess* "was clearly premised on a 'sale of assets' and not a transfer of stock. *Hess* does not answer the question presented here as to what assignment, if any, is required when a corporation merely transfers a majority of its stock." *Zambelli, supra,* at 422. The court noted that "Pennsylvania courts have historically held that the transfer of a corporation's stock does not destroy the corporate entity because 'a corporation is an entity irrespective of, and entirely distinct from, the persons who own its stock'." *Id.* at 423, citing *Monongahela Bridge Co., supra,* at 912. In light of that fact, the *Zambelli* court concluded:

> Based upon our review of Pennsylvania law and these axiomatic principles of corporate transactions, we agree that a stock sale, unlike a sale of assets, does not alter the corporate entity. Accordingly, we believe the Pennsylvania Supreme Court would hold that the transfer of some or all of the stock of a corporation has no effect on its ability to enforce a non-compete agreement. Because Zambelli's ... corporate restructuring was a stock sale rather than an

asset purchase, there was no need for an assignment of the non-compete provision.

*Id.* at 423.

■ While none of the above-cited cases specifically involve the sale of a limited liability company, we find the structure of the sale of equity membership interests that occurred in the matter *sub judice* to be akin to a sale of stock rather than an asset sale and, thus, find the reasoning behind those decisions applicable here.[5] A "membership interest" is an ownership interest in a limited liability company and is akin to an interest in stock of a corporation. Such interests may be evidenced by a certificate of membership interest, similar to stock issues. *Comment: New Business Options in Pennsylvania: A Critical Analysis of the Pennsylvania Limited Liability and Limited Liability Partnership Act of 1994*, U. PITT. L. REV. 129, 134 (Fall, 1995). Finally, like stockholders of a corporation, LLC members' liability is limited to the amount of capital invested. *Id.* at 130; 15 Pa.C.S.A. § 8922.

In light of *Ehrlich* and the instructive and persuasive reasoning of the federal courts in *Siemens* and *Zambelli*, we con-

---

**5.** Although we have been unable to uncover an appellate decision from this Commonwealth specifically addressing this factual scenario involving a limited liability company, the Court of Common Pleas of Lackawanna County has recently had occasion to do just that. In *American Homecare Supply Mid–Atlantic, LLC v. Gannon*, 10 Pa.D. & C.5th 362 (Lackawanna Cty.2009), Gannon had executed an employment agreement in connection with her employment with American Homecare, which contained non-solicitation and non-compete provisions. *Id.* at 366–67. In May 2009, Landauer acquired "100% of the issued and outstanding Membership Interests of [American Homecare]." *Id.* at 369. After continuing her employment for several months after the sale, Gannon submitted her resignation in October 2009 and went to work for a similar company situated within

50 miles of American Homecare. *Id.* at 372. American Homecare subsequently filed for an injunction, seeking enforcement of the restrictive covenants contained in Gannon's employment agreement. One of Gannon's arguments was that the sale of American Homecare to Landauer was an "asset sale" and, as such, the employment agreement was not enforceable because it was not specifically assigned to Landauer. *Id.* at 379. American Homecare, on the other hand, argued that the sale of membership interests was tantamount to a stock sale or equity interest transfer and, thus, an assignment was unnecessary. *Id.* at 380–81. The trial court agreed, concluding that "Landauer's purchase of the 'Membership Interest' units of American Homecare was synonymous to a stock sale rather than an asset sale." *Id.* at 381.

clude that the sale to Hub U.S. of the outstanding membership interests in Citizens Clair Insurance Agency, LLC and the subsequent name change was not a sale of assets and, thus, did not result in a change in the identity of Missett's employer. As such, the lack of an assignability clause in Missett's employment agreements is not an impediment to enforcement of its restrictive covenant by HubPa.[6] Accordingly, the trial court erred when it concluded that HubPa lacked standing to enforce the terms of the employment agreement.

■■■ We next address HubPa's claim that the trial court erred in finding the restrictive covenant unenforceable. In Pennsylvania, restrictive covenants are enforceable if: (1) they are incident to an employment relationship between the parties; (2) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and (3) the restrictions imposed are reasonably limited in duration and geographic extent. *All–Pak, Inc. v. Johnston*, 694 A.2d 347, 350 (Pa.Super.1997) (citations omitted). Post-employment restrictive covenants (i.e. those that restrict an employee's actions once his employment is terminated) are subject to a more stringent test of reasonableness than covenants ancillary to the sale of a business. *Insulation Corp. of America v. Brobston*, 446 Pa.Super. 520, 667 A.2d 729, 733 (1995). This heightened scrutiny stems from a historical reluctance on the part of our courts to enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade. *Id.* The determination of whether a post-employment restrictive covenant is reasonable, and therefore enforceable, is a factual one which requires the court to consider all the relevant facts and circumstances. *Id.* at 733–34.

The trial court found that Missett "was fired to protect [HubPa's] bottom line ... [and] not for poor performance." Trial Court Opinion, 12/11/09, at 4. For that reason only, the court concluded that the restrictive covenant was unenforceable against Missett. In so finding, the trial court relied on *Brobston* and *All–Pak* for the proposition that "Pennsylvania law is clear that where an employer fires an employee in order to protect its bottom line, and not for cause, that employer cannot thereafter enforce restrictive covenants against the employee." Trial Court Opinion, 12/11/09, at 3. We disagree with the trial court's reading of those cases.

■■ In *Brobston*, an employer wanted to enforce a non-competition covenant against a former employee who had been terminated for "failing to promote his employer's interests," i.e. poor performance. *Brobston, supra*, at 734–35. The court reasoned that:

[w]here an employee is terminated by his employer on the grounds that he has failed to promote the employer's legitimate business interests, it clearly suggests an implicit decision on the part of the employer that its business interests are best promoted without the employee in its service. [Such an employer] deems the employee worthless. Once such a determination is made by the employer, the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant.

*Id.* at 735. However, the court emphasized that the circumstance under which the employment relationship was terminated is but one "important factor to consider

---

**6.** As noted earlier, while Missett's contract did contain an assignability provision, its applicability was limited to "affiliates" of Citizens Clair, which HubPa is not.

in assessing both the employer's protective interests and the employee's ability to earn a living[.]" *Id.* at 737. In suggesting other factors that may be considered, the court cited with approval the following, from a decision of the Court of Common Pleas of Cuyahoga County, Ohio:

> [T]he courts ... focus a great deal of attention on such inquiries as: What is the situation of employee and his family? What is employee's capacity? Is employee handicapped or disabled in any way? What effect will the restraint have on employee's life? Will it deprive him of the opportunity [to support] himself and his family in reasonable comfort? Will it tend strongly to impoverish him? Will it force him to give up the work for which he is best trained or be expatriated? What are business conditions? Is there prevailing unemployment? Was the employment terminable at employer's will? Did employee work for employer a very brief time? What were the circumstances of termination of the employment? Did the termination constitute a breach of contract by employer? If not a breach, was it unreasonable? What is the character and extent of consideration to employee?

*Id.* at 536, 667 A.2d 729, citing *Arthur Murray Dance Studios, Inc. v. Witter,* 105 N.E.2d 685 (1952). Thus, the circumstances of termination are, alone, not determinative of whether the restrictive covenant is enforceable under *Brobston.*

The trial court also relied on *All–Pak, supra.* There, an employee, Johnston, entered into an employment agreement with All–Pak containing nondisclosure and noncompete provisions. All–Pak was subsequently sold in an asset purchase. Johnston continued to work for the company for a period of time but was eventually terminated. The record is silent on the reason for Johnston's termination; however, it is clear that it was involuntary. The lower court denied injunctive relief requested by All–Pak. On appeal, one of All–Pak's issues was "whether injunctive relief should have been denied on the basis that employer terminated the employee?" *Id.* at 350. Although the posture of the case rendered a discussion of this question moot, the court nonetheless addressed the issue briefly, as it was "likely to arise if appellant [sought] a permanent injunction." *Id.* at 352. In addressing the effect of All–Pak's termination of Johnston, the court discussed its earlier decision in *Brobston,* stating:

> We held that the fact that the employee was terminated, rather than quit voluntarily, was an important factor when considering the enforceability of a restrictive covenant. On the facts in that case, we determined that it was inequitable for the employer to obtain an injunction against the employee. We emphasized, however, that the reasonableness of enforcing such a restriction is determined on a case by case basis. Thus, the mere termination of an employee [alone] would not serve to bar the employer's right to injunctive relief.

*Id.* at 352 (emphasis added).

Based on our reading of *Brobston* and *All–Pak,* we conclude that the trial court erred in limiting its focus to the circumstances of Missett's termination. Indeed, with regard to the reasonableness and enforceability issues, the trial court opinion contains no discussion of *any* factor other than that Missett was fired "in order to protect [HubPa's] bottom line[.]" Trial Court Opinion, 12/11/09, at 3. Contrary to the trial court's reading, *Brobston* and *All–Pak* clearly hold that the circumstances of termination are but one of many factors to be considered by the court and that the issue of enforceability is one to be determined on a case-by-case basis.

The opinion of the trial court does not reflect any consideration given to factors weighing both for and against a finding of reasonableness and, thus, enforceability. For example, the evidence showed that Missett had access to a great deal of confidential and proprietary information belonging to HubPa. However, the court failed to consider any possible adverse effects on HubPa that could result from Missett's use of that information on behalf of a competitor. Nor did the trial court address the reasonableness of the two-year duration of the non-solicitation period. Additionally, Missett repeatedly signed Producer Agreements containing identical non-solicitation clauses and, in fact, at one point received $300,000 in exchange for agreeing to subject his formerly exempt clients to the terms of the non-solicitation agreement.[7] The trial court, having concluded that HubPa lacked standing to enforce the agreement(s), did not consider the relevance of Missett's repeated agreement to the terms of the Non–Solicitation Agreements. Similarly, the trial court failed to inquire as to any possible negative effects the restrictive covenant may have on Missett's ability to earn a living and support his family. Is the pool of potential customers so small that Missett would have difficulty developing a book of business on his own? Are these types of restrictive post-employment agreements standard and customary in the insurance industry? These and other factors could have, and should have, been weighed by the trial court in an effort to determine whether the terms of the agreement were reasonable. *All–Pak, supra.*

In sum, the trial court, based on a myopic reading of *Brobston* and *All–Pak,* failed to consider any factor other than that Missett was terminated "to protect [HubPa's] bottom line" and, for this reason, we are compelled to remand for further proceedings in accordance with this opinion. The court is directed to consider the facts and circumstances enumerated above, as well as any others that may be relevant to a determination as to whether the non-solicitation clause is reasonable and enforceable.

We next consider whether the trial court erred as a matter of law in refusing to admit evidence concerning the negotiation and meaning of the June 30, 2005 agreement, pursuant to which Missett "sold" his

---

7. With regard to the 2005 Amendment to Producer Agreement in which Missett sold to Citizens Clair his "exempt clients" in exchange for the sum of $300,000.00, we cannot agree with HubPa that this transaction amounted to a "sale of a business" such that the non-solicitation agreement would be subject to a less rigorous reasonableness examination. *See Hess, supra,* at 920 ("general covenants not to compete, which are ancillary to employment[,] will be subjected to a more stringent test of reasonableness than that which is applied to such restrictive covenants ancillary to the sale of a business."), citing *Hayes v. Altman,* 438 Pa. 451, 266 A.2d 269, 271 (1970). Although HubPa characterizes the transaction as a "sale of a business," we take a different view of the transaction. Missett was an employee of HubPa prior to executing the Amendment and he remained an employee of HubPa thereafter. Subsequent to the Amendment, his compensation structure with regard to the formerly "exempt" clients changed and those clients also became subject to the non-solicitation provision of his Producer Agreement. Otherwise, nothing changed. In short, Missett's situation is entirely distinguishable from the factual scenarios in the cases HubPa cites in support of its contention. *See Scobell, Inc. v. Schade,* 455 Pa.Super. 414, 688 A.2d 715 (1997) (owner/operator of sheet metal shop bound by terms of non-compete agreement executed as part of sale of his business to another company, of which he became an employee subsequent to sale); *Worldwide Auditing Services, Inc. v. Richter,* 402 Pa.Super. 584, 587 A.2d 772 (1991) (former employee and equity shareholder bound by non-compete agreement signed upon relinquishment of ownership interest in company).

exempt client list to HubPa in exchange for the sum of $300,000. Evidentiary rulings are committed to the sound discretion of the trial court and will not be overruled absent an abuse of discretion or error of law. *Whitaker v. Frankford Hosp.*, 984 A.2d 512, 522 (Pa.Super.2009). An abuse of discretion is not merely an error of judgment and the party challenging an evidentiary ruling must do more than convince the appellate court that it might have reached a different conclusion. *Paden v. Baker Concrete Const.*, 540 Pa. 409, 658 A.2d 341, 343 (1995). Rather, the challenging party must show that the trial court's judgment was manifestly unreasonable, or the result of impartiality, prejudice, bias or ill-will, as shown by the evidence of record. *Id.*

Our role in the interpretation of a contract is well settled:

> Determining the intention of the parties is a paramount consideration in the interpretation of any contract. The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. However, as this Court stated in *Herr Estate*, 400 Pa. 90, 161 A.2d 32 (1960), "where an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances."

We first analyze the [contract] to determine whether an ambiguity exists requiring the use of extrinsic evidence. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.

*Thomas Rigging & Constr. Co. v. Contraves, Inc.*, 798 A.2d 753, 755–56 (Pa.Super.2002), quoting *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 389–90 (1986).

Although HubPa properly raised this issue in its Pa.R.A.P. 1925(b) statement, the trial court neglected to discuss it in its opinion. However, on the record, the trial court engaged in the following exchange with counsel:

> Q: Now, with respect to [the 2005 Amendment], did you ever have any discussions with Missett about what the result of this agreement would be?
>
> MR. LOFTUS: Objection, Your Honor, parole [sic] evidence.
>
> THE COURT: Yes, the agreement is reduced to writing. It says what it says.
>
> MR. MARCUS: Well, parole [sic] evidence is admissible if there may be an ambiguity.
>
> THE COURT: There is no ambiguity. I am selling you this for 300. I am paying you 300 to buy it. What is the ambiguity?
>
> MR. MARCUS: What the import is, we read a line which is different than the way you read the line, which is—
>
> THE COURT: That's your problem. I am the guy who is going to make the decision as to what it means. It is reduced to writing. Whatever these people talked about beforehand was reduced to writing. Parole [sic] evidence says when you have got a writing, it is ambiguous on its face, which I say it is [sic] and I am the guy who counts, then parole [sic] evidence does not allow any testimony to the contrary. So there you go, sustained.

N.T. 11/20/09, at 107–08.

In its brief, HubPa does not specify exactly which line of the 2005 Amendment

it believes it interprets "different than the way [the court] read[s] the line[.]" *Id.* It states merely that "the questioning that was prohibited was directed at discussions that parties had regarding the 2005 Agreement." Brief of Appellant at 36. However, in its post-trial motion, HubPa provides some elucidation of its position:

> The parol evidence rule does not prevent HubPa from adducing testimony about the intention of the parties and meaning of the 2005 Agreement; the testimony would not have contradicted any term in the Agreement, but would have shown that the parties specifically intended that Missett, in exchange for $300,000, would not solicit any customers after he left HubPa's employ. Missett claims that the parties did not intend that he should be bound by the non-solicitation provisions of the 2002 Producers Agreement while HubPa contends just the opposite.

Motion for Post–Trial Relief, R.R. at 585a.

Based upon our reading of this excerpt from its post-trial motion, it appears that HubPa's purpose for seeking to admit extrinsic evidence is to "bootstrap" the terms of the earlier Producer Agreement using the 2005 Amendment, which references the earlier Producer Agreement. However, as we have already determined that the trial court erred when it concluded that HubPa lacked standing to enforce the Producer Agreement, it appears that this issue is now moot and any error on the part of the trial court would be harmless.

 HubPa next claims that the trial court erred in permitting Missett to enter into evidence the deposition testimony of three non-party witnesses. The testimony of these witnesses, Michael E. Baran, Walter G. Shively and Patrick Tyrrell, was offered in support of Missett's contention that he did not solicit HubPa clients to switch to Safegard. HubPa cites Pa.

R.Civ.P. 4020, which governs the use of deposition testimony at trial and provides as follows:

(a) At the trial, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had notice thereof if required, in accordance with any one of the following provisions:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of a deponent as a witness, or as permitted by the Pennsylvania Rules of Evidence.

(2) The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a party or a person designated under Rule 4004(a)(2) or 4007.1(e) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party, may be used by an adverse party for any purpose.

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds

(a) that the witness is dead, or

(b) that the witness is at a greater distance than one hundred miles from the place of trial or is outside the Commonwealth, unless it appears that the absence of the witness was procured by the party offering the deposition, or

(c) that the witness is unable to attend or testify because of age, sickness, infirmity or imprisonment, or

(d) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena, or

(e) upon application and notice that such exceptional circumstances exist as to make it desirable, in the interest of jus-

tice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

Pa.R.Civ.P. 4020(a). HubPa argues that the depositions were inadmissible hearsay, as Missett did not demonstrate that any of the witnesses were unavailable or that he exercised due diligence to locate the witnesses and procure their in-court testimony.

Missett responds that the admission of the deposition testimony is governed not by Rule 4020, but by Pa.R.Civ.P 1531, which applies to requests for preliminary and special injunctions and provides in relevant part as follows:

> (a) . . . In determining whether a preliminary or special injunction should be granted and whether notice or a hearing should be required, the court may act on the basis of the averments of the pleadings and may consider affidavits of parties or third persons or any other proof which the court may require.

Pa.R.Civ.P. 1531(a). Missett further argues that any error by the trial court in admitting the deposition testimony was harmless, as it was not relied upon by the court and was irrelevant to the court's determination regarding the enforceability of the restrictive covenant. The trial court did not address this issue in its opinion. However, on the record, the court engaged in the following exchange with counsel:

> MR. LOFTUS: Your Honor, we have three depositions of the folks that were subpoenaed by HUB and gave depositions pursuant to those subpoenas. There were three customers that went from HUB to Safegard. I don't think it will take me more than five minutes, or so, to read these in. And with Your Honor's indulgence, I could have Mr. Pockers take the stand and I will ask the questions and he can give the answer.

> MR. MARCUS: I am going to object under the rules, under the Civil Procedure Rules. They have to establish unavailability. They were only our witnesses as in we noticed them. They are third parties, they're not parties to this. They're not officers, they're not corporate designees. They could have been subpoenaed. As a matter of fact, my understanding is they were asked if they were going to be here. There has to be some showing beyond the fact that they'd like to read them in as opposed to—

> THE COURT: My understanding is depositions can be used just about for anything during trial.

> MR. MARCUS: Well, if you give me a moment, I have a brief on that point.

> THE COURT: Forget the brief. I am going to allow it.

> . . .

> MR. MARCUS: May I give the court the law on this topic?

> THE COURT: Yes, of course.

> . . .

> MR. MARCUS: [I]t is very clear from the rule that under the circumstances they have to make a showing. There is no indication they're dead, thank God, I don't believe they're dead, I hope they're not dead. There is no indication that they couldn't be obtained through subpoena, that they left the state; there is nothing. If you look at Rule 4020 it says I could use the deposition—any party could use the deposition of any other party. They're not a party. And, I would argue, not only is it a violation of 4020, but it constitutes rank hearsay. It is just not appropriate. They could have brought these people, they chose not to.

THE COURT: They're under oath. It was taken pursuant to this case, you had the opportunity to cross-examine them. It's good. I am going to let it in. If you want to call them and bring them in to rebut anything that is said in this, that is your prerogative.

MR. MARCUS: May I have my exception noted as to all three depositions?

THE COURT: Yes, sure.

N.T., 10/2/08, at 142–45.

We conclude that the trial court erred in admitting the deposition testimony without a showing by Missett that one of the conditions under Pa.R.Civ.P. 4020(a)(3) applied. The case was before the court on requests for a declaratory judgment as well as preliminary and permanent injunctive relief. After two days of hearings, the trial court granted Missett a judgment declaring the non-solicitation agreement unenforceable. The court further found that Missett's request for injunctive relief was moot and denied HubPa's request for injunctive relief. Thus, we conclude that the trial court's ruling on the admissibility of the deposition testimony was made primarily in the context of a final hearing on the merits of the case and not a preliminary or special injunction. Accordingly, the trial court should have required a showing of unavailability under Rule 4020, which it clearly did not. As Missett made no showing of unavailability, and the court made no finding of such, it was error to admit the deposition testimony into evidence. *Hall v. Owens Corning Fiberglass Corp.*, 779 A.2d 1167, 1171 (Pa.Super.2001) (holding that trial court erred in admitting deposition testimony where no showing made by proponent under Pa.R.Civ.P. 4020(a)(3) of unavailability or exceptional circumstances).

However, Missett argues that, even if the trial court erred in admitting the deposition testimony, the error was harmless "because the trial court did not cite to or rely upon the depositions in any way in its decision, nor was the testimony relevant to the court's ultimate determination of whether the restrictive covenant was enforceable." Brief of Appellee, at 16. HubPa, on the other hand, asserts that the trial court's ruling "directly affected the outcome of the case by permitting three crucial witnesses to testify, through inadmissible hearsay, why they moved their insurance accounts from HubPa to follow Missett to Safegard." Brief of Appellant, at 41. A review of the challenged testimony reveals the following:

### MICHAEL E. BARAN

Michael E. Baran is Vice President of A–Deck, Inc and runs the day-to-day operations of the company. Baran Deposition, 9/17/08, at 10, 12. He stated that he is involved in the decision-making process regarding A–Deck's employee benefit plans and would be involved in any changes made with regard thereto; however, he was not involved in the decision to switch from HubPa to Safegard. *Id.* at 32–33, 47–49. Baran testified that he had never met Missett and does not know who he is. *Id.* at 16, 40.

### WALTER G. SHIVELY

Walter G. Shively's deposition was taken in his capacity as designated corporate officer of Mega Construction Company pursuant to Pa.R.Civ.P. 4007.1(e). Shively Deposition, 9/26/08, at 11. Shively stated that he is the corporate representative with the most knowledge regarding Mega's corporate health plan and its procurement and has the most knowledge regarding Mega's switch of brokers from HubPa to Safegard. *Id.* at 12. Shively testified that he had met Missett two times "roughly eight to ten years ago" while working for a previous

employer. *Id.* at 29. He stated that he had spoken to Missett less than five times on the telephone, although not recently, and that he had not spoken to Missett since his termination from Hub-Pa on April 29, 2008. *Id.* at 32–33. Shively testified that he did not know that Missett was employed by Safegard and was surprised to learn that he was, because "if he is employed by Safegard and we are with Safegard, and he handles employee benefits, I would have thought that he would have been in contact with me with regards to the account." *Id.* at 44.

### PATRICK TYRELL

Patrick Tyrell, Vice President of U.S. Roofing, testified that he decides which broker the company uses for its insurance needs. Tyrell Deposition, 9/17/08, at 27–28. Tyrell testified that he is friends with Missett. *Id.* at 14. He stated that he is also close friends with Frank Svitek, another employee of HubPa and Tyrell's contact for property and casualty insurance there. *Id.* at 27. Tyrell indicated that he had gotten a sense from Svitek that Svitek's job at HubPa might not be secure, which led Tyrell to believe he might need to begin searching for a new insurance broker. *Id.* at 25. He stated that he became aware of this possibility a couple of months prior to the date Missett was terminated by HubPa. *Id.* at 52–53. Tyrell further testified that, when he began searching for a new insurance broker, he considered Safegard due to

a recommendation given by a colleague at another roofing company. *Id.* at 47–49. Finally, Tyrell testified that U.S. Roofing would have taken its employee benefits business to whichever broker it decided to use for its property and casualty business, regardless of whether Missett remained at HubPa. *Id.* at 93.

In sum, this testimony tends to prove that Missett had no involvement with A–Deck, Mega and U.S. Roofing moving their insurance business to Safegard. Had the trial court found the non-solicitation clause to be enforceable, the testimony may have been a factor militating against granting the injunctive relief requested by HubPa. In that case, we would likely conclude that the error made in admitting the testimony was not harmless. However, our "harmlessness" analysis is complicated by the fact that the trial court found the non-solicitation clause unenforceable. Thus, the testimony would have been essentially irrelevant to the trial court's denial of injunctive relief, as it would have made no difference whether Missett did or did not actively solicit customers of HubPa for his new employer if there were no enforceable Non–Solicitation Agreement.[8]

Judgment reversed; case remanded for proceedings in accordance with this opinion. Jurisdiction relinquished.

---

8. Nonetheless, as we have concluded that the trial court erred in its application of the law regarding the enforceability of the non-solicitation agreement, the issue of the admissibility of the deposition testimony will likely arise again in the proceedings on remand. Thus, we emphasize to the trial court that a party wishing to admit deposition testimony of a non-party witness in lieu of in-court testimony must make a showing, under Pa.R.Civ.P. 4020(a)(3), that the witness is unavailable, or of the existence of exceptional circumstances making it desirable to allow the deposition to be used.