## WELLS FARGO BANK, National Bank, National Association

### v.

## DAUPHIN COUNTY GENERAL AUTHORITY.

**Appeal of: Saybrook Capital, LLC.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 4, 2011.

Decided March 16, 2011.

Samuel W. Cortes, Exton, for appellant Saybrook Capital, LLC.

George M. Linge, Pittsburgh, for appellant Wells Fargo Bank.

Guy P. Beneventano, Harrisburg, for appellee.

BEFORE: PELLEGRINI, Judge, and LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Saybrook Capital, LLC (Saybrook) and Wells Fargo Bank, National Association (Trustee) appeal the decision of the Court of Common Pleas of Dauphin County (trial court) denying their motion made pursuant to the Declaratory Judgment Act, 42 Pa. C.S. §§ 7531–7541, to approve the proposed disposition of property known as Forum Place because the transaction did not constitute a sale or other disposition as contemplated in the Fourth Amendment of the parties' Trust Indenture.

The facts of this case are not in dispute. Forum Place is a real estate development project located in the City of Harrisburg consisting of parking facilities and a multi-story office building. It is owned by the Dauphin County General Authority (DCGA) subject to the rights of the bond-holders. Saybrook is the controlling bond-holder because it is the beneficial owner of not less than 66 2/3% of the aggregate principal amount of the 1998 A Bonds currently outstanding (Forum Place bonds) on

the Forum Place project. DCGA default-ed in the payment of principal and interest on the Forum Place bonds, which total nearly $90 million in aggregate principal amount. Therefore, in 2003 the previous trustee[1] filed a complaint against DCGA and the parties stipulated that Robert Chernicoff, Esquire (Receiver) would be appointed as receiver.

Over the next several years, several amendments were made to the Trust Indenture between DCGA and the Trustee. The amendment at issue in this case is the Fourth Amendment dated February 1, 2007. The Fourth Amendment added a new section to the Trust Indenture, Section 8.03A entitled "Sale of Facilities," which provides in pertinent part as follows:

> Upon the happening and during the continuance of any Event of Default specified in Section 8.01 hereof, then in every such case, the Trustee shall, upon the written request of the Registered Owners of not less than 66 2/3% of the aggregate principal amount of the 1998 A Bonds and Additional Bonds then Outstanding ... request in writing that the Authority *sell or otherwise dispose of* all or substantially all of the Facilities, or any portion thereof, to such persons or entities, and with such terms and conditions affecting the Authority as shall be reasonably acceptable to the Authority, as the Trustee shall designate in accordance with the written request or approval of such requesting Registered Holders. The Authority covenants and agrees that if any such request is made, the Authority will do all things necessary or required to cause the Facilities, or any portion thereof, *to be sold or disposed of* ...

(Reproduced Record (R.R.) at 363a). (Emphasis added).

On September 19, 2007, Saybrook made a written request to the Trustee pursuant to Section 8.03A to direct DCGA to enter into an agreement of sale of Forum Place to Rubenstein Partners Acquisitions, LLC (Rubenstein). That same day, the Trustee made such a written request to DCGA. While DCGA approved the agreement of purchase and sale, Rubenstein later exercised its termination right, and the deal fell through. In 2007 and 2008, Saybrook's counsel and the Receiver pursued a master lease strategy for Forum Place in which the Commonwealth would lease the entire building. DCGA approved a lease agreement for this transaction.

In April 2010, Saybrook initiated another proposed transaction which it claimed would dispose of substantially all of the Forum Place office and parking facilities by *selling* them to the Pennsylvania Economic Development Financing Authority (PEDFA). Pursuant to Section 8.03A, Saybrook sent a written request regarding the proposed transaction to the Trustee, who in turn made a written request to DCGA. Under the proposed transaction, PEDFA would issue revenue bonds (PEDFA bonds) and would pay the proceeds of the PEDFA bonds to DCGA as the acquisition price for Forum Place. The proceeds would retire the Forum Place bonds and PEDFA would take legal title to Forum Place. PEDFA would then sell Forum Place back to DCGA pursuant to an installment sales agreement, with installment payments made solely out of revenues from Forum Place. According to Saybrook, the installment payments would be structured so as to permit full and timely payment of the principal and interest due on the PEDFA bonds. Once the installment sales contract has been completed and all bondholders have been paid, which Saybrook admits will not be until

---

1. Wells Fargo Bank succeeded M & T as trustee on or about July 31, 2003.

some point in excess of 20 years, legal title to Forum Place would be reconveyed to DCGA, free of all liens.

DCGA did not take any formal action on Saybrook's request. In a letter to the trial court, DCGA indicated it was not opposed to the sale of Forum Place but that it considered the proposed transaction a refinancing mechanism rather than a true sale. Therefore, on July 13, 2010, Saybrook filed a motion to approve the proposed disposition of Forum Place pursuant to the Declaratory Judgment Act requesting that the trial court compel DCGA "to execute any and all documents necessary to effect [sic] the PEDFA Restructuring." (R.R. at 19a). Both the Trustee and the Receiver joined in this motion, and they all maintained that the proposed transaction qualified under the Fourth Amendment as a sale or disposition of all or substantially all of the Forum Place facilities.

The trial court held an evidentiary hearing on Saybrook's motion on August 19, 2010. At that hearing, Jeff Wilson (Mr. Wilson), a shareholder in Saybrook Capital, testified on behalf of Saybrook that DCGA owed a little over two million dollars in arrears and the principal was somewhere between eight and 10 million dollars. Mr. Wilson testified that by approving the proposed transaction, DCGA would be absolved of any liability on a going-forward basis with respect to the defaulted bonds, meaning it would be relieved of roughly 10 million dollars in current liability owed to the bondholders. According to Mr. Wilson, DCGA would not be liable for the PEDFA bonds and that after all the bondholders were paid under the proposed transaction, DCGA would own Forum Place free and clear of any liability. On cross-examination, Mr. Wilson admitted that under the proposed transaction DCGA would still have a stake in the ultimate outcome of the property

because it would regain title to Forum Place and would regain management responsibility for the facilities. He also admitted that the statement that DCGA would end up with title free and clear of all liens was based on the assumption that there would be sufficient revenue from the parking and office facilities to pay off the PEDFA bonds. Mr. Wilson admitted that he had no idea what condition the facilities would be in when DCGA finally regained title some 20 years in the future and until that time DCGA would have no control or input as to the operation of the facilities.

Donna Kreiser, Esquire (Attorney Kreiser), a municipal finance attorney, testified on behalf of DCGA. Attorney Kreiser testified that she reviewed the proposed transaction and term sheet at the request of DCGA and that in her opinion the proposed project was a refinancing of the existing bonds through an installment sales agreement. (R.R. at 241a). She testified that DCGA would be required to make installment sales payments to PEDFA during the life of the financing, after which Forum Place would revert back to DCGA. (R.R. at 241a). Attorney Kreiser testified, "It's not an outright purchase of real estate. It's a financing mechanism to facilitate the refinancing of the existing debt." (R.R. at 242a). When asked why she believed the proposed transaction was not an outright purchase, she stated, "Although title was transferring to PEDFA[,] initial beneficial ownership remains in the General Authority and the property ultimately reverts back to the General Authority." (R.R. at 242a). According to Attorney Kreiser, DCGA would hold the title to Forum Place at all times and she did not believe PEDFA would receive a deed at the beginning of the project. (R.R. at 242a). After reviewing all of the indentures for the Forum Place Project, Attorney Kreiser testified that she did not believe DCGA was obligated to refinance

the bondholders' debt. (R.R. at 244a). On cross-examination, Attorney Kreiser admitted that legal title of Forum Place would be transferred to PEDFA under the proposed transaction.

DCGA also presented the testimony of Jay Wenger (Mr. Wenger), a financial advisor with the firm Susquehanna Group Advisors, who serves as an advisor to DCGA. Mr. Wenger testified that he had 25 years of experience in the municipal financing industry, with approximately 17 of those years spent specializing in non-profits and project finance. Mr. Wenger admitted that he did not have any personal experience evaluating PEDFA transactions. (R.R. at 247a). While he testified that he had been involved in sale lease-backs similar to the proposed transaction, he could not remember the specific parties involved in the similar transactions. (R.R. at 248a). Counsel for Saybrook opposed Mr. Wenger being qualified as an expert because he was not able to identify these specific transactions and because he did not have PEDFA experience. (R.R. at 248a). The trial court accepted Mr. Wenger as an expert, stating these issues went more to the weight of his testimony rather than his expertise. (R.R. at 248a). Mr. Wenger testified that he reviewed the proposed transaction and proposed term sheet, explained it to the DCGA board, and that in his opinion this was a sale lease-back. (R.R. at 249a). According to Mr. Wenger, DCGA's objective had always been to dispose of and sell Forum Place and he and his firm did not believe the proposed transaction satisfied this sale objective. (R.R. at 249a). Mr. Wenger testified that he believed the transaction was a sale lease-back and not an outright sale because DCGA would continue to be responsible for making debt service payments and at the end of the term Forum Place would revert back to DCGA. (R.R. at 249a). According to Mr. Wenger, the pro-

posed transaction was essentially monetizing debt, converting the unrealized value of Forum Place to cash. (R.R. at 249a). On cross-examination, Mr. Wenger admitted that the Forum Place bonds were currently in default; that pursuant to the proposed transaction DCGA would no longer be in default; and that DCGA's obligation essentially would disappear pursuant to the proposed transaction. (R.R. at 250a).

The trial court denied Saybrook's motion, concluding that the proposed transaction did not constitute a sale or disposition of Forum Place under the plain meaning of the language contained in the Fourth Amendment to the Trust Indenture. The trial court determined that the proposed transaction was merely a refinancing of the existing indebtedness because title to the facilities was not being sold to any third party and would actually be re-vested in DCGA. Given the language of Section 8.03A, the trial court concluded that DCGA had not agreed to consent to and support any and all transactions regarding Forum Place, such as the proposed refinancing of the current indebtedness. Rather, the trial court concluded that DCGA only agreed to those transactions "which would constitute the sale or relinquishment and giving up of all or substantially all of Forum Place facilities."

 Saybrook filed a notice of appeal challenging the trial court's conclusion that the proposed transaction was not a sale or other disposition of Forum Place. Saybrook also alleged that the trial court erred in permitting Mr. Wenger, DCGA's financial advisor, to testify as an expert witness. In its Rule 1925(a) Memorandum Opinion, the trial noted that Mr. Wenger had 25 years of experience in municipal financing and while he did not have experience directly with PEDFA projects, he

had personal experience with sale lease-backs similar to the proposed transaction. The trial court stated that it accepted Mr. Wenger's expertise and permitted him to testify because he had specialized knowledge and experience regarding the proposed transaction, beyond that of a layperson. This appeal followed.[2]

■ As a preliminary matter, Saybrook argues that the trial court abused its discretion by allowing Mr. Wenger to testify as an expert because he lacked the required qualifications. Saybrook argues that Mr. Wenger's experience was mostly in non-profit work and he lacked any experience specifically relevant to PEDFA sales. According to Saybrook, Mr. Wenger failed to testify that he or anyone else on DCGA's behalf actually evaluated the proposed transaction and DCGA failed to establish Mr. Wenger had specialized knowledge concerning the proposed transaction. Saybrook argues that allowing DCGA's own financial advisor to testify as an expert was error, and that it was not harmless error because the trial court relied heavily upon his opinion in rendering its decision.

The rule for qualifying and providing testimony as an expert witness, found in Pa. R.E. 702, is as follows:

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa. R.E. No. 702. The Supreme Court of Pennsylvania has adopted the following standard for qualifying a witness to testify as an expert:

It is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has *any* reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required.... It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience.

*Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 481, 664 A.2d 525, 528 (1995).

---

2. The parties are in dispute over the proper standard and scope of review to be utilized by this Court. DCGA argues that our scope of review in declaratory judgment actions "is limited to determining whether the trial court committed an error of law or abused its discretion, and whether substantial evidence exists to support its findings." *Twp. of Forks v. Forks Twp. Municipal Sewer Authority*, 759 A.2d 47, 51 n. 2 (Pa.Cmwlth.2000). While this is a true statement, the underlying substantive issue in this case is that of contract interpretation, a question of law. When reviewing an issue of law in a declaratory judgment action, an appellate court's standard of review is *de novo* and the scope of review is plenary. *Missett v. Hub Int'l Pa., LLC*, 6 A.3d 530, 534 (Pa.Super.2010) (citing *Wimer v. Pa. Employees Benefit Trust Fund*, 595 Pa. 627, 640, 939 A.2d 843, 850 (2007)). The qualification of an expert witness rests within the sound discretion of the trial court. *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 481, 664 A.2d 525, 528 (1995). Absent an abuse of discretion, we will not overturn the trial court's decision. *Id.*

Mr. Wenger has over 25 years of experience in the field of municipal financing, the majority of which was spent specializing in project financing and credit review and analysis. Contrary to Saybrook's claims, Mr. Wenger specifically testified that he reviewed the proposed transaction and term sheet in order to render an opinion as to whether it was in DCGA's best interest to go forward with the transaction. This amounts to substantial evidence to support the trial court's finding that Mr. Wenger possessed specialized knowledge and experience, beyond that of a layperson, regarding the proposed transaction as well as municipal financing. The mere fact that Mr. Wenger could not remember the specific names of parties involved in similar transactions spanning his 25 year career is of no moment. Mr. Wenger's testimony regarding the proposed transaction was clearly capable of assisting the trier of fact, and we will not disturb the trial court's determination.

■ Saybrook's main argument on appeal is that the trial court erred as a matter of law in finding that the proposed transaction is not a sale or other disposition under the Fourth Amendment. Saybrook argues that the intent of contracting parties is to be determined from the express language of the agreement, the terms as manifestly expressed. The Fourth Amendment specifically references a sale or other disposition of the Forum Place property. Saybrook argues that a disposition of property refers to a transfer of a partial or entire interest in property. Saybrook cites several cases for the proposition that a disposition of property occurs whenever title to the subject property passes from one party to another, regardless of whether that transfer fully divests the party of any and all future rights in or to the property.[3] According to Saybrook, something less than a total divestiture of property, such as a lease or refinancing mechanism, can and should be considered a disposition under the Fourth Amendment. Saybrook also argues that the trial court's contractual interpretation equates a sale with a disposition of property, rendering the language "other disposition" meaningless. We disagree.

■ The focus of contract interpretation is on the terms of the agreement, the plain language of the contract. *Delaware County v. Delaware County Prison Employees Independent Union,* 552 Pa. 184, 189, 713 A.2d 1135, 1137 (1998). The Fourth Amendment to the parties' Trust Indenture does not define the terms "sale" or "other disposition." Therefore, we turn, as did the trial court, to the common understanding and accepted definitions of these terms. The term "sale" is defined as "the transfer of property or title for a price,"[4] or "the transfer of ownership of and title to property from one person to another for a price."[5] We do not agree with Saybrook's argument that the proposed transaction qualifies as a sale. It is clear from the record that the property at issue, Forum Place, is not truly being transferred from one party to another. DCGA will at all times remain tied to the property. All that is accomplished by the proposed transaction is a refinancing of

---

**3.** Saybrook cites to the following cases in support of its proposition: *Pines v. Farrell,* 577 Pa. 564, 848 A.2d 94 (2004); *Gumberg Associates–Chapel Square v. Comm. of Pa.,* 116 Pa.Cmwlth. 35, 541 A.2d 401 (1988); *Hahnemann Medical College and Hospital of Philadelphia v. Comm. of Pa.,* 52 Pa.Cmwlth. 558, 416 A.2d 604 (1980).

**4.** Black's Law Dictionary, 1454 (9th Ed.2009).

**5.** Merriam–Webster Dictionary (11th Ed.2010).

the existing indebtedness, and under the Fourth Amendment, DCGA has not agreed and is not obligated to take all steps necessary to complete a refinancing of the property. The Supreme Court of Pennsylvania classified a similar scheme as a "sale and lease-back financing technique" in *East Hempfield Township v. City of Lancaster,* 441 Pa. 406, 410, 273 A.2d 333, 335 (1971), and we are inclined to agree.

The term disposition, on the other hand, is defined as "the act of transferring something to another's care or possession, esp[ecially] by deed or will; the relinquishing of property." [6] This definition, in particular the use of the word 'relinquish,' supports a common understanding that a disposition of property is something final and concrete, a divestiture of assets. It is clear that under the terms of the proposed agreement, DCGA will not relinquish or be divested of Forum Place. Instead, the refinancing scheme will tie DCGA to the property in excess of another 20 years and it will eventually regain full title to the property. Based upon the plain language of the Fourth Amendment, we find that the intent of the parties was to affect a sale or divestiture of Forum Place; therefore, DCGA is not obligated to approve the proposed refinancing scheme. In addition, even if the proposed transaction qualified as a sale or disposition, the terms and conditions of the transaction affecting DCGA must be "reasonably acceptable to [DCGA]." DCGA's own financial advisor, Mr. Wenger, testified that he did not have all the specifics regarding the proposed transaction and that he advised DCGA against approving the proposed transaction because the refinancing scheme would not dispose of or divest DCGA of the asset. Instead, it would tie DCGA to the property for years to come. In addition, Saybrook's own witness admitted that the conclusion

that DCGA would regain title to Forum Place free and clear of all liability was based on the assumption that revenues from the property would be sufficient to satisfy payment on the PEDFA bonds. There is no guarantee this will occur, and Saybrook did not present any evidence to the trial court or DCGA to support this assumption.

As the trial court noted, our role in this dispute is not to determine whether the proposed transaction makes good business sense. Rather, our role is merely to interpret the terms of the contract as expressed by the plain language of the parties' agreement. Because we do not believe the proposed transaction qualifies as a sale or other disposition under the terms of the parties' agreement, the order of the trial court is affirmed.

### ORDER

AND NOW, this 16th day of March, 2011, the decision of the Court of Common Pleas of Dauphin County, dated September 30, 2010, is affirmed.

6. Black's Law Dictionary, 539 (9th Ed.2009).