# Eckert v. Lehigh Valley Women's Med. Spec., P.C.

2

*Douglas J. Smillie,* for plaintiff.
*Loren L. Steziale,* for defendant.

REIBMAN, *J.*, February 29, 2012—

In this employment dispute, Stephanie B. Eckert, D.O., and Mary P. Greiss-Coult, D.O., seek injunctive relief in the form of a declaration that they are free from the obligations of restrictive covenants contained in employment contracts each entered into with Lehigh Valley Women's Medical Specialties, P.C. They also seek to enforce provisions of their respective employment agreements entitling them to salary and payment of fees and insurance coverage. In turn, Lehigh Valley Women's Medical Specialties, P.C., has petitioned to enjoin the physicians from pursuing other employment opportunities allegedly in violation of the non-compete agreements. Arguments were scheduled on May 5 and August 3, 2011, and hearing was held on November 17, 2011, at which time all parties agreed that the matter was ripe for final disposition, notwithstanding the fact that the matters had initially been styled in part as requests for preliminary injunctive relief. In accordance

with the following findings of fact and conclusions of law set forth in narrative form, the restrictive covenant shall be enforced against Dr. Eckert. However, Dr. Greiss-Coult is not bound by the restriction and, additionally, she is entitled to salary and payments of insurance coverage owing under her contract of employment.

I.

In 1997, Eric Rittenhouse, M.D., formed Lehigh Valley Women's Medical Specialties, P.C., ("the practice"). With its offices located at 440 South 15th Street in Allentown, Pennsylvania, the practice offered full obstetrical and gynecological care, including deliveries, surgeries and other aspects of women's health. Its patients are treated at St. Luke's Hospital in Allentown and Bethlehem, Sacred Heart Hospital in Allentown, and Westfield Hospital in Allentown. At the time the present litigation commenced, the practice had about 9,000 active patients, of whom approximately 70% lived within ten miles of the South 15th Street address. Dr. Rittenhouse has always been the majority shareholder and president of the practice.

After becoming acquainted with Dr. Rittenhouse in the course of her residency, Dr. Eckert joined the practice on August 1, 2000. Before she joined the practice, Dr. Eckert had become aware that Dr. Rittenhouse had a history of chemical dependency and had been subject to monitoring by the Physicians Health Program ("PHP") to address his condition. Nevertheless, Dr. Eckert joined the practice and became a shareholder as of January 1, 2003, pursuant to a Shareholder Employment Agreement. In pertinent part, that agreement provides:

3. Term of Employment. The term of this agreement

shall be for one year from the date set forth above and from year to year thereafter unless either party gives nine (9) months' written notice of intent to terminate it at any time....

11. Restrictive Covenant.

a. Limitation.

Employee therefore agrees that, while an employee and for a period of two (2) years after his/her employment ends (for any reason), he/she will not render any services on behalf of himself/herself or any business or entity within a ten (10) mile radius of employer's office(s) or other place(s) of business maintained by the employer at the time the employee's employment ends (the "protected area"). This promise includes employee's not practicing at any hospital or health care facility within the protected area at which employer's remaining physicians maintain staff privileges[.] except St. Lukes [sic] Bethlehem only.

....

12. Non-solicitation Covenant.

a. Restriction. ...Employee therefore agrees that, if his/her employment ends for any reason or in any manner, whether or not he/she practices within the restricted area as described above, he/she will in no event:

(i) solicit for treatment any former or existing patient (or member of any patient's household) of the employer;

(ii) induce or attempt to influence any employee or patient of the employer to terminate his or her

relationship with the employer;

(iii) induce or attempt to influence any hospital, other health care facility, any physician or any other professional with a referring relationship with the employer to alter in any way that relationship; and/or

(iv) solicit any patient service contractual arrangement of the employer.

These restrictions apply during employee's employment and for a period of two (2) years immediately following the end of employee's employment.

(See Pl.'s Hrg. Ex. 2, 11/17/2011).

Dr. Greiss-Coult met Dr. Rittenhouse and Dr. Eckert during her residency at St. Luke's Hospital in Allentown. She, too, became apprised that Dr. Rittenhouse had a history of addiction. Nevertheless, she agreed to join the practice as an employee effective on or about September 1, 2006, pursuant to an employment agreement, dated December 8, 2005. That written agreement provided in relevant part as follows:

....

10. Restrictive Covenants

...[W]hile you are a non-owner employee and for a period of two (2) years after your employment ends (for any reason), you will not render any medical services on behalf of yourself, any business or entity within a ten (10) mile radius of the practice's main office at the time your employment ends (currently located at 440 South 15th Street, Allentown, Pennsylvania). This

promise includes your not providing any services at the hospitals during this two (2) year period. Notwithstanding the foregoing, provided that you do not maintain an office and/or practice base within the ten (10) mile 'restriction noted above, nothing shall prevent you from admitting patients and/or delivering babies at St. Luke's Hospital's Bethlehem campus and/ or Lehigh Valley Hospital Center.

....

11. Non-solicitation Covenants

...[Y]ou agree that both during your employment and thereafter, if your employment ends (regardless of the reason or manner of termination), that you will not commit any act, which would harm the practice. Specifically, you agree that you will not directly or indirectly: (i) directly solicit for treatment any former or existing patient (or member of any patient's household) of the practice (notwithstanding the foregoing, nothing shall prevent you from utilizing mass media forms of advertising); (ii) induce or attempt to influence any employee or patient of the practice to alter his or her relationship with the practice in any way; (iii) induce or attempt to influence any hospital, other health care facility, any physician or any other professional with a referring relationship with the practice, including any managed care payer, to alter that relationship in any way; or (iv) solicit any patient service contractual arrangement of the practice.

(See Pl.'s Hrg. Ex. 1,11/17/2011.)

In respect to termination notice and payments owing in

such circumstances, Dr. Greiss-Coult's written agreement provided in pertinent part as follows:

1. Term

...[E]ither you [employee] or the practice may terminate your employment for any reason at any time on sixty (60) days written notice to the other.

....

5. Business Expenses — While you are an employee, the practice will also pay the cost of your professional liability insurance at standard premium rates, your medical license fees for the Commonwealth of Pennsylvania and federal DEA license, hospital staff membership fees and mutually agreed professional society dues....

If your employment with the practice ends at any time and for any reason, you agree that the practice will be entitled to cancel your professional liability and other insurances effective as of your last date of employment and the practice shall be entitled to receive any refund(s) of unused premiums from such insurance companies for those policies. In addition, you agree that, upon termination of your employment for gross negligence, misconduct, loss of your license to practice medicine in the Commonwealth of Pennsylvania, or your voluntary separation, you shall pay the cost of any needed malpractice reporting endorsement (also known as "tail coverage") and Mcare penalties..... If your employment is terminated by the practice for reasons other than gross negligence, misconduct, loss of your license to practice medicine in the Commonwealth of Pennsylvania, or

your voluntary separation, the practice shall pay the cost of any tail insurance and Mcare penalties....

At some point prior to December 2009, the practice was considering whether to purchase the practice of Dr. Bruce Viechnicki, located at 1611 Pond Road in Allentown, approximately five miles from the practice. As part of the practice's due diligence in deciding whether to purchase Dr. Viechnicki's practice, from approximately December 2009 until July 2010, Dr. Eckert spent most of her time and Dr. Greiss-Coult spent about one-half of her time at Dr. Viechnicki's office. Drs. Eckert and Griess-Coult liked Dr. Viechnicki's office, with Dr. Griess-Coult characterizing it as an "exciting opportunity." Ultimately, however, the practice did not acquire Dr. Viechnicki's operation.

On the evening of August 25, 2010, Dr. Rittenhouse was scheduled to provide on-call coverage for the practice until 8:00 a.m. the following morning. He had consumed three and one half glasses of wine with his dinner that evening. After falling asleep sometime after midnight, he was awakened at 4:30 a.m. by a telephone call from St. Luke's Hospital, informing him that a patient of the practice had been admitted in active labor. He consumed another glass of wine at this time and then approximately an hour later he received a "911 page" from the hospital. After attempting to telephone the hospital without success, Dr. Rittenhouse drove to the Hospital. While en route, his vehicle struck the steps of a church; however, he proceeded to complete his trip to the hospital despite a flat tire. In the meantime, the patient had delivered her baby. After Dr. Rittenhouse visited the patient, he observed police officers surrounding his vehicle and thereafter he was arrested. His blood alcohol content was measured in

excess of the legal limit for operation of a motor vehicle, and he was placed on medical leave by St. Luke's Hospital the following day.

Dr. Rittenhouse's behavior concerned Dr. Griess-Coult. She found it disconcerting that the senior partner in the medical practice in which she was affiliated would put himself in such a position so as to potentially injure the reputation of the other physicians in the practice and place the health and safety of a patient in jeopardy. She expressed that concern to each of the physicians in the practice. According to Dr. Griess-Coult, she and the other physicians in the practice tried to be supportive of Dr. Rittenhouse, hoping that he would take the "appropriate channels" to remedy the situation. However, as months went by, she became less confident the situation would improve. Dr. Rittenhouse could not cover on-call duties or perform surgeries or deliveries because his privileges had been suspended. In addition, the only other physician in the practice, Dr. Holli Warholic, had become pregnant and would be taking a maternity leave, necessitating that Dr. Greiss-Coult and Dr. Eckert cover all the deliveries at St. Luke's Allentown three days a week and cover on-call duties every night of the week.

Meanwhile, as part of an effort to regain his medical privileges, Dr. Rittenhouse was required to attend a residential rehabilitation treatment facility. He entered such a facility in January.[1]

Concerned about this situation, Dr. Griess-Coult sought

---

1. Some concern soon emerged regarding whether the facility chosen by Dr. Rittenhouse satisfied the requisites of the PHP monitoring program. The choice of facilities was, however, retroactively approved after his admission. See infra.

counsel in January or February to determine her options, including separation from the practice. On February 3, 2011, she learned Dr. Rittenhouse was in a rehabilitation facility in Florida instead of a pre-approved rehabilitation program in the Pocono Mountains of Pennsylvania, where she thought he had been receiving treatment. Counsel representing both Dr. Eckert and Dr. Griess-Coult wrote to Dr. Rittenhouse by letter dated February 4, 2011. (Deft. Hrg, Ex. 1, 11/17/2011). That letter recited continuing concerns about the August 2010 incident, including Dr. Rittenhouse's lack of attendance at work and inadequate communication regarding his return. It also asserted his choice of a non PHP-approved treatment center jeopardized re-instatement of his medical privileges and his medical license. The letter then stated:

> It is clear to both Dr. Eckert and Dr. Griess-Coult that they can no longer continue to be associated with you in a professional capacity at the practice. By your very public misconduct and arrest, which was witnessed by multiple people including the patient and the patient's family, the professional name and good will of the practice has now been significantly and irrevocably damaged.

> ...Clearly, as a result of your arrest for DUI, the suspension of your admitting privileges by St. Luke's Hospital, and your PHP mandated participation in the rehabilitation program, you are unable to fulfill your duties as an employee of the practice. This creates grounds for the termination of your employment by the practice.

> Because of your actions, you have forced Drs. Eckert

and Griess-Coult *to consider* leaving the practice. Both of my clients would like to make a clean break in light of your conduct and of your breach of your own employment agreement with the practice.

(*Ibid.* emphasis added.) The letter further argued that the restrictive covenants in both Dr. Eckert's and Dr. Greiss-Coult's employment agreements were unenforceable, contending Dr. Rittenhouse's actions had "irrevocably damaged the reputation of the practice and any good will the practice may once have had in the medical community" and, therefore, "[t]he practice no longer has any legitimate business interests to protect by restricting Drs. Eckert and Griess-Coult's ability to practice medicine in the Lehigh Valley." The correspondence concluded by requesting a response within seven days, otherwise, Drs. Eckert and Greiss-Coult would "presume" that Dr. Rittenhouse would "agree to the non-enforcement of...[the] restrictive covenants as contained in th[e] employment agreements." (See *id.*)

Dr. Rittenhouse and the practice, through their counsel, did, however, respond within the seven-day timeframe. By letter dated February 10, 2011, they conveyed their expectation that Drs. Eckert and Griess-Coult would comply with the terms of their agreements, including the restrictive covenants. (See Leh. Valley Women's Medical Specialties Brf., filed June 30, 2011, Ex.D.) That correspondence also stated that Dr. Rittenhouse and the practice understood the February 4, 2011, letter of Drs. Eckert and Greiss-Coult to be formal notice of their intent to resign their employment in accordance with their employment agreements. (See *id.*)

On April 1, 2011, Drs. Eckert and Griess-Coult filed an action against the practice for declaratory relief seeking to have their non-compete covenants declared null and void on the basis that the practice had no legitimate business interest to protect. In support of that position, Drs. Eckert and Greiss-Coult contended Dr. Rittenhouse, as majority shareholder of the practice, had engaged in embarrassing and criminal behavior and lost his hospital privileges, all resulting in a diminution of the revenues, reputation and goodwill of the practice. By letter dated April 8, 2011, counsel for Dr. Rittenhouse and the practice reiterated their view that the February 4, 2011, letter qualified as Drs. Eckert and Griess-Coult's formal notice of intent to terminate their employment with the practice and that the practice considered the non-compete clauses to be in full force and effect. Dr. Eckert and Dr. Greiss-Coult each deny that the February 4, 2011, letter constituted a notice of resignation; instead, they insist the letter amounted to a demand to open up communications in order to discuss the problematic situation surrounding Dr. Rittenhouse' arrest and suspension of privileges.

The parties conducted discovery, including depositions, the transcripts of which have been filed of record as exhibits in this matter. Meanwhile, adhering to its position that the February 4, 2011, letter constituted a notice of resignation, the practice, by letter dated May 27, 2011, informed Dr. Greiss-Coult that she would no longer be compensated for her services at the practice as of June 1, 2011. Subsequently, on June 15, 2011, Dr. Greiss-Coult formed her own practice under the name of Seasons of Life Obstetrics & Gynecology, PC, ("seasons of life") and opened her practice on July 6, as a tenant in

Dr. Viechnicki's office at Pond Road. Although she has full staff privileges at St. Luke's Hospital in Allentown, St. Luke's in Bethlehem, and Sacred Heart Hospital in Allentown, Seasons of Life is practicing only at St. Luke's Hospital in Allentown, where Dr. Griess-Coult now serves as chief of obstetrics. On August 22, 2011, Dr. Eckert submitted her immediate resignation from the practice and on September 1, 2011, began employment with Seasons of Life at the Pond Road Location. (See Pl. Hrg. Ex. 6, 11/17/2011, N.T., 11/17/2011, at 108.) Both Dr. Eckert and Dr. Greiss-Coult continue to exercise privileges at St. Luke's Allentown.

In response, the practice, in September 2011, filed its own action seeking injunctive relief to enforce the non-compete agreements, contending that those clauses prohibit both Drs. Eckert and Greiss-Coult from seeing patients at either the Pond Road office or St. Luke's Allentown for a period of two years post termination. That action has been consolidated with the matter commenced by Drs. Eckert and Greiss-Coult. After hearing held on November 17, 2011, the parties' competing claims are now ripe for decision.

## II.

Covenants not to compete are no strangers to the higher courts of this commonwealth. Quoting liberally from a leading law review journal, the Pennsylvania Supreme Court has articulated the rationale underlying such provisions:

"The employer's point of view is that the company's clientele is an asset of value which has been acquired by virtue of effort and expenditures over a period

of time, and which should be protected as a form of property. Certainly, the argument goes, the employee should have no equity in the custom which the business had developed before he was employed. Similarly, under traditional agency concepts, any new business or improvement in customer relations attributable to him during his employment is for the sole benefit of the principal. This is what he is being paid to do. When he leaves the company he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cashbox." Blake, employee agreements not to compete, 73 Harv.L.Rev. 625, 653-54 (1960).

*John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 9, 369 A.2d 1164, 1168 (1977). Recognizing at least some validity in this point of view, the Pennsylvania Supreme Court has thus upheld the enforceability of post-employment restraints "where they are incident to an employment relation...between the parties to the covenant,...the restrictions [are] reasonably necessary for the protection of the employer[,] and...the restrictions are reasonably limited in duration and geographic extent." *Ibid.*

The Superior Court has also observed, however, that because they operate as restraints on trade, non-compete agreements are not favored in the law and, thus, will only be enforced where necessary to protect the legitimate business interests of the employer:

Post-employment restrictive covenants (i.e. those that restrict an employee's actions once his employment is terminated) are subject to a more stringent test of

reasonableness than covenants ancillary to the sale of a business. *Insulation Corp. of America v. Brobston*, 446 Pa.Super. 520, 667 A.2d 729, 733 (1995). This heightened scrutiny stems from a historical reluctance on the part of our courts to enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade. *Id.* The determination of whether a post-employment restrictive covenant is reasonable, and therefore enforceable, is a factual one which requires the court to consider all the relevant facts and circumstances. *Id.* at 733-34.

*Missett v. Hub Intern. Pennsylvania, LLC*, 6 A.3d 530, 538 (Pa.Super. 2010). Construing its earlier decisions in *Brobston* and *Missett*, involving the import to be ascribed to termination of employment by the employer, the Superior Court has also recently instructed:

It is clear that a restrictive covenant can be enforced even if an employee is terminated by an employer, and the fact that an employee was fired without reason, standing alone, will not prevent a non-compete from being upheld. *Missett v. Hub Intern. Pennsylvania, LLC*, 6 A.3d 530 (Pa. Super. 2010)....On the other hand, it is equally clear that the fact that an employee is terminated without cause is a factor that can be considered in determining whether enforcement of a non-compete advances the employer's business interest. *Brobston*, supra. The reasoning is as follows:

Where an employee is terminated by his employer on the grounds that he has failed to promote the employer's legitimate business interests, it clearly suggests an implicit decision on the part of the employer that

its business interests are best promoted without the employee in its service. Such an employer deems the employee worthless. Once such a determination is made by the employer, the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant. *Missett*, supra at 538 (quoting *Brobston*, supra at 735).

*Shepherd v. Pittsburgh Glass Works, LLC*, 25 A.3d 1233, 1246 (Pa. Super. 2011).

The upshot of these recent pronouncements by the Superior Court is that although important, termination, alone, is not determinative. Instead, whether a non-compete agreement will be enforced must be evaluated in terms of whether it is reasonable and necessary on the facts of each individual case. See, e.g., *Misset*, supra, 6 A.3d at 538 (citing factors including, inter alia, reasons for termination, effect of enforcement on employee and employer, length of employment, extent of consideration to employee). With those principles in view, the inquiry turns to the facts at hand.

## III.

Drs. Eckert and Greiss-Coult both contend that as a consequence of Dr. Rittenhouse's conduct, the practice no longer has any legitimate business interests to protect. Specifically, they argue that the damage to the reputation of the practice resulting from the August 2010 incident has undermined any good will and, therefore, they should be freed of the constraints otherwise imposed by the restrictive covenant found in their employment agreements.

This argument is not supported by the facts presented. Neither Dr. Eckert nor Dr. Greiss-Coult have adduced any evidence fairly indicating that the practice has suffered such consequences. In fact, when questioned directly, they could point to no more than a handful of patients who had even mentioned the incident and but one who actually chose to leave the practice because of the events surrounding the Dr. Rittenhouse's arrest and suspension. Accordingly, the argument regarding the alleged lack of legitimate business interests provides no basis to deny the benefit flowing from this contractual provision.

Less clearly, Drs. Eckert and Greiss-Coult posit that the particular fact of Dr. Rittenhouse's relapse and arrest in August 2010 should deny the practice the right to enforce the non-compete provisions. In support of that argument, Drs. Eckert and Greiss-Coult contend that Dr. Rittenhouse's conduct would justify termination of his employment and, were it not for his majority shareholder status, he would have been properly terminated. What remains unclear and unsubstantiated in this setting, however, is how an alleged failure on the part of the practice to terminate another employee would operate so as to relieve the obligations of Drs. Eckert and Greiss-Coult to the practice under their individual contracts of employment. Notably, despite knowledge of his condition, neither Dr. Eckert nor Dr. Griess-Coult negotiated a provision in their respective employment agreements to address the possibility Dr. Rittenhouse might suffer a relapse or to indicate that his continuing service should be deemed a condition of their agreement to work for the practice. In short, they have identified no provision in their agreements that would render a failure of the practice to discharge *another*

*party* as a breach of either of those agreements. Although mention is made of the doctrine of unclean hands, that principle of equity will be addressed below. For present purposes, however, it must be concluded that the facts and arguments presented in support of their claims on this issue provide no *contractual* ground upon which to excuse performance of the non-compete agreements contained in the employment agreements.

The question of the implications of alleged termination of employment by the practice, however, presents a more complex picture. Although at the inception of these proceedings, Dr. Eckert and Dr. Greiss-Coult, alike, insisted they had not resigned through the letter of February 4, 2011, or otherwise, the record is now clear that Dr. Eckert in fact tendered her immediate resignation on August 22, 2011. As such, there is no basis to invoke the principles first set forth in *Brobston*, supra, to relieve her of the restrictions found in her employment agreement. Moreover, in view of Dr. Eckert's knowledge beforehand of Dr. Rittenhouse's condition and her extended history of working with him evidently without incident, equity will not deem his episode of relapse and attempt to seek treatment for his condition at a facility ultimately approved by PHP, without more, as sufficient evidence of unclean hands so as to deprive the practice of the remedy of injunction. Dr. Eckert's role as shareholder and officer in the closely held corporation also accorded her opportunities to challenge any allegedly oppressive behavior, and the fact that she did not avail herself of those options also weighs against her contention that the injunction should not issue.[2]

---

2. See 15 Pa.C.S.A. § 1767 (remedy of shareholder to bring action for appointment of custodian in face of oppression or deadlock). Particularly

Accordingly, in full consideration of all of the attending circumstances, Dr. Eckert will be enjoined from violating the restrictive covenants contained in her employment contract. However, in view of the precarious nature in which her pregnant patients might find themselves in the wake of an immediate injunction, the enforcement of the non-compete clause will be stayed for 60 days to allow patients with imminent deliveries to receive their care as planned and to afford Dr. Eckert's other patients an opportunity to make arrangements as necessary.

The balance of the equities in respect to Dr. Greiss-Coult, however, compels a different outcome. As noted above, the practice bottoms its argument on its reading of the February 4, 2011, letter as an unequivocal notice of resignation. Fairly read, however, in conjunction with the testimony presented to this court, the letter of February 4, 2011, was not a definitive notice of resignation; instead, it announced Drs. Eckert and Greiss-Coult's intention "to consider" leaving the practice and amounted to a conditional notice of resignation that would be effective if no reply were received within the mandated seven days. A response was, however, communicated, thereby obviating the contingency set forth in the letter, namely, that in the absence of a reply, Drs. Eckert and Greiss-Coult would be leaving the practice with the understanding that Dr. Rittenhouse and the practice agreed with the terms of the non-compete provision were not applicable. But when Dr. Rittenhouse and the practice responded through their counsel that the non-compete agreement would be

as it concerns her patients, a court of equity also looks with disfavor upon the short-notice upon which Dr. Eckert abruptly exited the practice in August 2011. (See N.T., 11/17/2011, at 75-77.)

enforced, the condition for Dr. Greiss-Coult's departure was removed and, thus, the resignation did not follow. Indeed, in the course of their negotiations, counsel for Dr. Greiss-Coult informed the practice that its reading of the February 4, 2011, letter misconstrued the intent of Dr. Greiss-Coult. Further, the objective intent of this letter was corroborated through the subsequent actions of Dr. Greiss-Coult, who continued to report to work until the practice on May 27, 2011, *informed her* that she would no longer be paid for her services as of June 1, 2011.

Nor does the present record lend any credibility to the claims asserted by Dr. Rittenhouse and the practice that Dr. Greiss-Coult was terminated for cause in relation to alleged misconduct involving the staff of the practice. On this score, Dr. Greiss-Coult's testimony proved credible, while Dr. Rittenhouse's vague references to "some complaints" by nameless individuals purportedly in relation to Dr. Greiss-Coult proved unconvincing. (See N.T., 11/17/2011, at 29-30.)

Rather, on this record, it is plain that it was the practice that unreasonably and unilaterally "deemed" the February 4, 2011, letter as a notice of resignation and, through its communication dated May 27, 2011, terminated Dr. Greiss-Coult without the requisite 60-days notice required under the agreement. In view of these circumstances, including the good-faith basis Dr. Greiss-Coult had to open a dialogue concerning the future of the practice in light of the difficulties attending Dr. Rittenhouse (see N.T., 11/17/2011 at 97-101, 124-25), it readily appears that the practice sought fit for its own purposes to discard the services of Dr. Greiss-Coult. As such, a chancellor sitting in equity will not hear the practice complain that what it has

deemed worthless should nonetheless be deemed worthy of protection so as to warrant enforcement of the covenant not to compete. The fact that Dr. Rittenhouse as majority and controlling shareholder of the practice appeared quite willing, even eager, to cast off Dr. Greiss-Coult supports such a conclusion. (See N.T., 11/17/2011, at 30.)

Additionally, in light of Dr. Greiss-Coult's junior position vis-a-vis Dr. Rittenhouse and relatively brief duration of employment with the practice, enforcement of the non-compete agreement would work an inequitably harsh result in the circumstances of this case in which her employment was terminated against her will. Importantly, unlike Dr. Eckert, Dr. Greiss-Coult lacked shareholder standing to seek relief vis-a-vis Dr. Rittenhouse and the practice under the business corporation law. The record also reveals that Dr. Greiss-Coult explored employment possibilities outside the non-compete area within the Lehigh Valley region, but with her limited professional history, understandably chose to let space from a familiar colleague, Dr. Viechnicki.

Therefore, in full consideration of all the evidence in this case, notions of fairness that constitute the touchtone of equity's jurisprudence command that the non-compete agreement not be enforced against Dr. Greiss-Coult. Furthermore, it is a timeless maxim that equity follows the law. And, although not advanced by Dr. Greiss-Coult expressly, the material breach by the practice through its failure to provide the sixty-days notice due under the contract has the effect of discharging her remaining liabilities under the contact, which would include future obligations in respect of the non-compete provisions. See *Oak Ridge Const. Co. v. Tolley*, 504 A.2d 1343, 1346-47

(Pa. Super. 1985) (material breech relieves non-breaching party of future obligations); see also *Ward v. American Mut. Liab. Ins. Co.*, 443 N.E. 1342, 1343-44 (Mass. App. 1983) (breach by employer in discharging employee before time allotted in contract constituted material breach and afforded employee remedy of suing for total breach while excusing future obligations under non-compete provision with no set-off therefor to employer). As such, as part of her legal remedy, Dr. Greiss-Coult is entitled to be freed of her obligations under the non-compete agreement.

IV.

For the foregoing reasons, a decree declaring the restrictive covenant unenforceable against Dr. Greiss-Coult will be issued. Additionally, Dr. Greiss-Coult shall be entitled to pay through July 26, 2011, pursuant to the sixty-days-notice requirement contained in her employment contract. Also, under the terms of the employment agreement, the practice was obliged to provide insurance coverages and professional fees and dues through July 26, 2011. Dr. Greiss-Coult's and Dr. Eckert's remaining claims for back-pay have not been proven through any evidence presented at hearing; therefore, those claims will be dismissed.[3] Finally, under the mandatory provision of the Wage Payment and Collection Law (WPCL), 42 P.S. § 260.9a, Dr. Greiss-Coult is entitled to recovery of counsel fees upon filing of a motion therefor. See *Oberneder v.*

---

3. Drs Greiss-Coult and Eckert have also pled a right to withheld back pay; however, the evidence adduced at hearing failed to substantiate these claims. Specifically, there was no evidence regarding the four hours of pay for Dr. Greiss-Coult, while the testimony of record in respect to Dr. Eckert's claims indicates that as a shareholder and officer of the corporation, she routinely acquiesced in the temporary delay in payment to mitigate cash-flow concerns.

*Link Computer Corp.*, 548 Pa. 201, 204-205, 696 A.2d 148, 150-51 (1997) (awarding fees upon motion and holding legislative inclusion of "shall" in statute renders award of attorney's fees mandatory where employee prevails in recovery of wage or fringe benefits); see also *Voracek v. Crown Castle USA, Inc.*, 907 A.2d 1105, 1109 (Pa. Super. 2006) (WPCL policy of making employee whole without incurring cause of collection militates award of counsel fees even when employment contract reformed by court on grounds of mutual mistake). The practice and Dr. Rittenhouse, of course, may contest the reasonableness of any claims for such fees. All remaining claims of the parties will be denied.

## ORDER

And now, February 29, 2012, upon consideration of the petition for injunctive and declaratory relief, filed by Stephanie B. Eckert, D.O., and Mary P. Greiss-Coult, D.O., on April 4, 2011, and brief in support thereof filed on June 15, 2011, and the response to said motion filed on April 26, 2011, and brief in opposition to the petition, filed on June 30, 2011, and after argument held on August 3, 2011, and upon consideration of the petition, filed on September 29, 2011, by Lehigh Valley Women's Medical Specialties, P.C., and response thereto, filed on November 17, 2011, and after hearing held on November 17, 2011; and upon consideration of the amended complaint filed on November 30, 2011; Answer, filed on December 20, 2011; and answer to new matter, filed on January 3, 2012, and for the reasons set forth in the accompanying opinion,

It is ordered that said petitions are granted in part and denied in part.

It is further ordered and decreed that, effective April 30, 2012, and for a period of two (2) years thereafter, Stephanie B. Eckert, D.O., shall be enjoined from engaging in any further activity in contravention of the restrictive covenants contained in her employment agreement that constitutes the basis for the within dispute.

It is further ordered and decreed that the non-compete agreement contained in Dr. Greiss-Coult's employment agreement is unenforceable and that, consistent with the accompanying opinion, Dr. Greiss-Coult is entitled to benefits and payments owing under her contract of employment with Lehigh Valley Medical Specialties, P.C., through July 26, 2011.